IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DION LESLIE WRIGHT,                          *
                    Petitioner,
v.                                           *    CIVIL ACTION NO. DKC-08-750

ROBERT KOPPEL, et al.,                       *
                    Respondents.
                                           ***

## MEMORANDUM

Now before the court is a Petition for habeas corpus relief filed by Dion Leslie Wright (Paper

No. 1); Respondents' Answer (Paper No. 9); and Petitioner's Reply thereto.  (Paper Nos. 13 and 14).

After review of these documents, the court finds no need for an evidentiary hearing.  *See* Rule 8(a),

*Rules Governing Section 2254 Cases in the United States District Courts.*  For the reasons to follow,

the Petition will be denied and dismissed with prejudice.

## Factual History

The facts adduced at trial, as described by Petitioner in his brief filed in the Court of Special

Appeals of Maryland, are as follows:

> The first witness called to the stand was Baltimore City Police Officer Robert Crown.
> Officer Crown testified that he was on duty on the evening of January 26, 2003 at
> 7:30 p.m., when he responded to a call for a shooting at the Father & Son Carryout,
> 228 N. Monroe Street in Baltimore City.  Upon arriving at the scene the Officer
> observed three males had been shot.  Officer Crown was unable to get any
> information regarding the shooting from any of the victims.

> Michael Johnson testified that he was shot in the neck, rendering him a quadriplegic.
> Johnson further testified that he and his cousin, Archie Clark, along with Thomas
> Harrison were in the Father & Son Carryout on the evening of January 26, 2003 when
> a male entered the establishment, stated, "what's up," and started shooting.  Johnson
> "kind of" got a good look at the shooter's face, notwithstanding that the shooter put
> his shirt over this face.  The shooter was wearing a green jersey according to Johnson.
> When Johnson had seen Appellant at some unspecified time prior to the shooting,
> Appellant was wearing a red sweat suit.  While hospitalized, Johnson selected
> Appellant's photograph as being that of the person who shot [him] and the others.

Photographs were shown to Johnson a second time in the hospital, when he again selected Appellant's photograph--this second showing of photographs was videotaped by the police. According to Johnson, the shooter had short, plaited hair. Despite having selected Appellant's photograph as that of the shooter, Johnson testified that Appellant was not in fact the person who shot [him], Clark and Harrison. Johnson further testified that he was under medication at the time he chose Appellant's photograph, although this did not affect his vision or ability to understand what was happening. On cross-examination, Johnson admitted he had been drinking and smoking marijuana prior to having been shot, and described himself at the time as drunk. Johnson also testified that the real shooter had much darker skin than Appellant.

Thomas Harrison testified that he, Archie Clark, and Michael Johnson were inside the Father & Son Carryout when all three were shot. Specifically, Harrison was shot in the jaw. Harrison did not get a look at the shooter although he did tell the police that the shooter was light-skinned and had been wearing a white and green Jets jersey. Harrison also told the police that he might have been shot because he owed money to someone named "Mike." On January 29, 2003, three days after the shooting, Harrison selected a photograph of an individual named Michael Holman as being the "Mike" he owed money to. However, Harrison testified that Holman was not the shooter.

Detective Darren Fuentes testified that sometime in February 2003, he participated in the arrest of Appellant outside the address of 3306 W. North Avenue. At the time of his arrest, Appellant was wearing a red, white, and blue baseball cap and a jersey with the same colors.

Detective Frank Miller of the Baltimore City Police Department's Homicide Unit testified as the primary detective in the case. Detective Miller testified that the first time he tried to speak with Michael Johnson was in the hospital on January 28, 2003. However, Johnson was not able to speak at this time. In light of his inability to talk, the Detective instructed Johnson to blink one time for "yes" and two times for "no." With this in mind, the Detective asked Johnson if he knew who shot him, to which Johnson replied by blinking once. The Detective next saw Johnson the following day, January 29, 2003, however he was unable to talk with Johnson on this date. On January 30, 2003, the Detective again saw Johnson; this time Johnson was able to speak. On this date, Johnson described the shooter as having worn a green football jersey bearing the number 43, along with a green hat with a bird on it. At this time, Johnson described the shooter has having a medium to dark complexion. Johnson also stated his belief that an individual nicknamed "Boss," as well as an individual named Tracey Taft, knew the shooter's name or at least his nickname. The Detective proceeded to put together a number of photographs of people Johnson might be able to identify not as suspects, but rather as individuals who might have information

relevant to the case.   Appellant's photograph was one of those the Detective compiled, due to the fact that he was informed that Appellant was involved with Tracey Taft, one of the people Johnson believed might know the shooter's name or nickname.   On February 5, 2003, the Detective showed Johnson a photograph of Appellant, at which time Johnson said, "that's him."  The next day, February 5, 2003, the Detective again showed Johnson a photograph of Appellant--Johnson again identified Appellant, this time on videotape.  The Detective also interviewed Thomas Harrison, who described the shooter as light-skinned and wearing a green and white football jersey with the number 43.   The Detective also showed Harrison a photographic array containing the picture of Michael Holman; upon viewing the array, Harrison stated that Holman could not have been the culprit because he was larger than the shooter.  Harrison was also shown a photographic array containing Appellant's picture, from which he did not select anyone.  On February 13, 2003, Appellant was arrested.  The next day, February 14, 2003, the police executed search warrant on a van appellant had been driving.  Inside the van, the police found a number of jerseys of various professional sports teams (San Diego Chargers, New York Giants, San Diego Padres, Detroit Lions, Philadelphia 76ers, Houston Texans, and Boston Celtics.)  Additionally, three baseball caps were found, one matching to the Chargers jersey, one matching to the Celtics jersey, and a third, an Orioles hat, which apparently did not correspond with any of the recovered jerseys.  No green and white  jersey with number 43 was found, nor was a green hat with a bird on it.

At the conclusion of the Detective's direct examination, the following colloquy occurred:

[State]:        Detective Miller, did you have occasion to speak to Mr. [Michael] Johnson in August of 2003?

[Detective]:    Yes.

[State]:        Why did you speak to Mr. Johnson in August of 2003?

[Detective]:    His aunt had received some--Michael Johnson received a call stating that they wanted to

[Defense]:      Objection, Your Honor.

[Court]:        Sustained

[State]:        Did you go to the home, sir?

[Detective]:    Yes.

[State]:         And when did you go to the home in August?

[Detective]     When?

[State]:         When.

[Detective]:    I'm sorry. That was on August 6th.

[State]:         And as a result of going to the home, did you speak with anyone there?

[Detective]:    I'm sorry, it wasn't August 6th, It was August 8th, I believe, I spoke to Michael Johnson himself.

[State]:         And as a result of speaking with Mr. Johnson, what, if anything did you do?

[Detective]:    We did a special attention with the Western District to watch his house.  He had basically-a person contacted him and stated

[Defense]:       Objection, Your Honor.

[Court]:         Sustained.

….

[State]:         And what is the current status of his home, sir?

[Defense]:       Objection.

[Court]:         Sustained.

During cross-examination the defense introduced a photograph of Appellant taken at the Motor Vehicle Administration on December 12, 2002, approximately six weeks before the shooting.  The defense also introduced into evidence a second photograph of Appellant taken at the Motor Vehicle Administration, this one taken on February 11, 2003, roughly two weeks after the shooting.

At the conclusion of the State's case the defense opted not to make a motion for judgment of acquittal, after which Appellant elected not to testify.  The defense proceeded to call its only witness, Joan Faulcon.  Ms. Faulcon testified that she was in the Father & Son carryout on the evening in question, waiting on a food order, when three males entered the location.  Shortly thereafter, another male, wearing a

4

black mask and a green jersey and carrying a big gun, entered the store and shot the other three males.  Ms. Faulcon was not able to describe the masked shooter.

Following Ms. Faulcon's testimony, the defense rested, after which the defense made a motion for judgment of acquittal.  The court denied the motion, stating however, "it's not a very strong case."

Paper No. 9, Ex. 9, p. 4-10.

### Procedural History

In 2003, Petitioner was charged with offense of first-degree murder in the death of Archie Clark, and attempted first- degree murder of Michael Johnson and Thomas Harrison.  Petitioner was also charged with use of a handgun in the commission of a felony or crime of violence.  Paper No. 9, Ex. 1.  After a four day trial, the jury found Petitioner guilty of first-degree murder, two counts of attempted first-degree murder, and three counts of use of a handgun in the commission of a crime of violence. *Id*., Ex. 11.

After trial, but prior to sentencing, Petitioner moved for a new trial.  One ground raised by Petitioner was that he had not been "advised of his right to a court trial versus a jury trial." *Id*. Ex. 8.  The trial court denied the motion, finding that while the video recordings of the proceedings did not reveal whether Petitioner had been advised of his right to elect a bench trial, a notation of his being so advised appeared in the case file, and Petitioner understood his right to elect a bench trial based on advisements given to him in prior cases in which he pleaded guilty. *Id.* Ex. 8.  Thereafter, the trial court sentenced Petitioner to life plus 45 years imprisonment.  *Id*., Ex. 11.

On direct appeal Petitioner raised the following grounds: (1) the voir dire procedure was improper; (2) the court erred in allowing the State to introduce habit evidence pursuant to Maryland Rule 5-406; and (3) the State's questioning of a detective concerning the home of one of the victims

being under surveillance was improper.  *Id*., Ex. 9.  The Court of Special Appeals of Maryland affirmed the convictions.  *Id*., Ex. 11.

Petitioner filed a petition for writ of certiorari in the Court of Appeals of Maryland, claiming that the lower appellate court erred in finding that his claims regarding the voir dire procedure and introduction of habit evidence were not properly preserved..  *Id*., Ex. 12.  The petition was denied on March 10, 2006.  *Id*., Ex. 13.

On May 22, 2006, Petitioner filed for post-conviction relief in the Circuit Court for Baltimore City.  *Id*., Ex. 14.  The petition, as amended,  alleged that counsel was ineffective for failing to object to the  improper voir dire procedure and for failing to advise Petitioner of his right to a court trial.  *Id*., Exs.14 & 16.  On June 5, 2007, a counseled post-conviction hearing was held in the Circuit Court.  *Id*., Ex. 17.   Post-conviction relief was denied.  *Id*., Ex. 18.   Petitioner's application for leave to appeal was denied by the Court of Special Appeals of Maryland on May 29, 2007.  *Id*., Exs. 19-21.

Affording the *pro se* filing a generous construction, it appears that Petitioner is attempting to raise the sole claim that he was denied effective assistance of counsel due to counsel's failure to advise him of his right to be tried by a judge. Paper No. 1.

<u>**Threshold Considerations**</u>

**Timeliness & Exhaustion of State Remedies**

Respondents do not contend, and the court does not find, that the Petition was filed outside the one-year limitations period set forth in 28 U.S.C. § 2244(d)(1).  Further, Petitioner no longer has any state direct review or collateral review remedies available to him with respect to the claim raised in this court.  His claim is exhausted for the purpose of federal habeas corpus review.

## Standard of Review

Pursuant to statute, a federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits:

1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is "contrary to" Supreme Court precedent if "the state court applies a rule that contradicts the governing law set forth in our cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).[1] Section 2254(d) also requires federal courts to give great deference to a state court's factual findings. *See Lenz v. Washington,* 444 F. 3d 295, 299 (4th Cir. 2006). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct absent clear and convincing evidence to the contrary. The applicant has the burden of rebutting the presumption of correctness. A decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of

---

[1]Although § 2254(d) is a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), "which demands that state court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curium*), a state court decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 at 412-413. A state court decision is based on an "unreasonable application" of clearly established federal law when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409-410; *see also Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Booth-el v. Nuth*, 288 F.3d 571, 575 (4th Cir. 2002).

the evidence presented in the state court proceeding.   *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).   With these standards in mind, the court will address the merits of Petitioner's ineffective assistance claim.

To establish a claim of ineffective assistance of counsel under *Strickland  v. Washington*, 466 U.S. 668 (1984), a convicted defendant must demonstrate that counsel's performance (1) "fell below an objective standard of reasonableness," and (2) that counsel's deficient performance prejudiced the defendant.   *Id*. at 688, 692.   "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686.   The ultimate focus of the *Strickland* inquiry is on the "fundamental fairness of the proceeding whose result is being challenged." *Id*. at 696.

In evaluating whether counsel's performance fell below an objective standard of reasonableness, a court must consider "whether counsel's assistance was reasonable considering all the circumstances." *Id*. at 688.   In its analysis, a court must be "highly deferential," and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689 (internal quotations omitted).   A court must not use the benefit of hindsight to second-guess strategic decisions made by counsel unless they were unreasonable.  *Id*. at 690.

With regard to the prejudice prong of *Strickland*, a defendant need not demonstrate that the outcome of the proceeding would have been different, but rather that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Strickland*, 466 U.S. at 694.  Even if counsel committed a professionally unreasonable error, relief can be granted only if "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *See Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

## Analysis

Petitioner claims that trial counsel Margaret Meade did not advise him of his right to elect to be tried by a judge.  In denying post-conviction relief, the state court relied on grounds similar to the trial court's findings in denying the motion for new trial.  The post-conviction court found as follows:

> On February 27, 2004, Petitioner had a hearing for a new trial on this matter in front of the Honorable John C. Themelis.  In considering the Motion for a New Trial, Judge Themelis reviewed the record of a previous arraignment, which occurred on 10/21/99 (case #899292025).  The record from this previous case reflects that the Petitioner entered into an intelligent, knowing and voluntary guilty plea in accordance with Maryland Rule 4-246, which included being notified of his right to a court trial.  Referring to the previous case, Judge Themelis made the following record:
>
>> Court: "defendant had an eleventh grade education." Circ. Ct. For Baltimore City video recording for Feb. 27, 2004.
>>
>> Court: "He was advised by Mr. Mohamed in the presence of Judge Murdock pursuant to a guilty plea." *Id.*
>>
>> Court: "Judge Murdock found that his plea was voluntary and knowing plea [sic]." *Id.*
>>
>> Court: "It is well established that even in a criminal cases, admissions and statements made by counsel are chargeable against their client." *Id.*
>>
>> Court: "Mr. Wright was standing right next to you [defense counsel] in front of Judge Heard [for arraignment in this case] when you elected a jury trial.  I've already found that he knew the difference between a jury trial and a court trial as of the 10/21/99 advisement.  He did not object in front of Judge Heard.  Also, at all times in which

we were handling pretrial matters and the defendant was present, it was clear that we were going to pick a jury, again, he didn't object. I would have been more than happy to preside over a court trial[;] it would have took [sic] considerably less time. *Id.*

Court: "He could have objected at any time and gotten a court trial instead of a jury trial;, and based on my recollection, I didn't see him object in front of Judge Heard and I heard no objection up until the time and through the selection process. In fact, I probably, had he said something even before this jury began deliberations, I would have done one of two things, either declared a mistrial and then incorporated the testimony and allowed the State to finish their case and I would have heard a court trial, But [sic] I heard no such objection.

Court: "...the issue here is was it an improper arraignment because the defendant himself did not make the an election for court or jury. And with the State obtaining that tape, It's [sic] clear that he knew the difference and knew that he had a right to a trial by court and did not object when you selected a jury trial on his behalf." *Id.*

Court: "I believe by his inaction, he adopted your action. I deny your Motion for a New trial." *Id.*

Petitioner asserts that "he would have been better served by opting for a court trial, seeing as the court would have been less likely than the jury to have been swayed by sympathy for Mr. Johnson." Petitioner' Post Conviction Relief Brief, page 9. At the Post Conviction hearing, the Petitioner reiterated his contention. He stated that in his opinion the jury was affected by the victim's use of a wheel chair and that he did not think that a judge would have permitted the victim's condition to influence his or her determination as to whether Petitioner was guilty. Despite Petitioner's assertions, this Court agrees with the trial court when it denied the Motion for a New Trial and found that Petitioner was aware that he had the right to a court trial.

Though Petitioner might wish to "Judge shop" for a more favorable ruling, it is clear that Petitioner understood his right to a court trial and that trial counsel's alleged failure to advise him of a court trial in this matter does not yield "substantial possibility" [sic] that the result of the proceedings would have been different. This Court finds that Petitioner did not suffer from ineffective assistance of counsel [for failure to advise of a court trial] and there is no prejudice shown.

Paper No. 9, Ex. 18 at pps. 8-9. The post-conviction court erred in stating the prejudice prong of *Strickland* requires finding a "substantial possibility" that but for counsel's error the result of the trial would have been different.  The finding of the post-conviction court, however, does not reflect that this heightened standard was applied to Petitioner's claim.  Rather, the post-conviction court found no evidence of prejudice to Petitioner.   The post-conviction court found that Petitioner was otherwise aware of his right to elect a bench trial versus a jury trial and adopted the election of a jury trial made by his counsel.  Petitioner's trial did not involve complex facts or legal questions; rather, the sole issue at trial was the identity of the shooter.  There was no dispute that three people were shot inside the Father and Son Carry Out in West Baltimore.  The issue at trial centered on the credibility of victim Michael Johnson, who identified Petitioner as the shooter shortly after the shooting and then recanted at the pretrial motions hearing.  Petitioner failed to demonstrate that even if his trial counsel erred in not advising him of his right to be tried by a judge that he was prejudiced by that conduct.[2]  This court does not find that the post-conviction court's finding is an unreasonable determination of the facts or contrary to established Supreme Court precedent. As such, the finding of the post-conviction court shall not be disturbed.

---

[2]  It should also be noted that the issue about which Petitioner complains does not itself involve a federal right.  It is the right to trial by jury that is guaranteed in Article III, Section 2 of the Constitution.  There is, however, no Constitutional right to have one's case tried before a judge alone. *See Singer v. United States*, 380 U.S. 24, 34 (1965).  The ability to waive one's right to a jury trial does not "import a right to claim its opposite."  *See United States v. Sun Myung Moon*, 718 F.2d 1210,  1217-18 (2nd Cir. 1983).

**<u>Conclusion</u>**

In light of the rulings of the court,  the instant Petition for habeas corpus relief will be denied, and this case will be dismissed by separate order.


Date:      9/24/2009                                 _____/s/_____
                                                            DEBORAH K. CHASANOW
                                                            United States District Judge